IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MICHICAL ALLEN DOOLING,
SR., Father of Michichal Allen
Dooling, Jr. aka Michael Allen
Dooling, Jr. (Deceased), and
TANYA LYNN DOOLING-LONG,
as Administrator of the Estate of
Michichal Allen Dooling, Jr.,

     Plaintiffs,

v.

HENRY COUNTY, GEORGIA, et
al.,

     Defendants.

CIVIL ACTION FILE

NUMBER 1:12-cv-3127-TCB

## **O R D E R**

This civil rights case brought pursuant to 42 U.S.C. § 1983 arises

from the death of Michical Allen Dooling, Jr. ("Dooling") while in

pretrial detention at the Henry County Jail in McDonough, Georgia.

Dooling's sister (as administrator of Dooling's estate) and his father

filed this action alleging that Dooling's death was caused by

Defendants' deliberate indifference to his serious medical needs. They

also assert a state-law claim against Henry County Sheriff Keith

McBrayer, alleging that he violated his statutory duty to provide medical care to inmates at the county jail.

There are currently sixteen Defendants in this case. Plaintiffs sued McBrayer, Henry County, the Henry County Sheriff's Office, and six current and former jailers[1] at the Henry County Jail (collectively, the "Henry County Defendants"). Correcthealth Henry, LLC, a private entity that contracted to provide medical services to inmates and detainees at the Henry County Jail, is also a Defendant. Finally, Plaintiffs named six individual medical providers who provided medical services to inmates at the Henry County Jail (collectively with Correcthealth Henry, the "Correcthealth Defendants").[2]

Defendants have now moved for summary judgment as to all of Plaintiffs' claims [154 & 170]. For the reasons that follow, the Court will grant both motions.

---

[1] The jailer Defendants are Doyle Bates, Joshua Green, Kevin Clark, Gregory Blasingame, Curtis Fowler, and Timothy Parks.

[2] The medical-provider Defendants are James Barlow, a medical doctor who served as the jail's medical director during the time in question; Mark Davy, a physician assistant; Pamela McAdams and Katrea Leverette, registered nurses; and Adilah Farid and Nina Larimer, licensed practical nurses. Two other providers—Carlo Musso and Marie Lemo—were initially named as Defendants but successfully moved for dismissal shortly after the lawsuit was filed. [12].

# I.    Factual Background

## A.    Plaintiffs' Failure to Comply With Local Rule 56.1

As a preliminary matter, the Court notes that in responding to Defendants' motions, Plaintiffs have largely disregarded Local Rule 56.1(B). Plaintiffs include citations to record evidence in response to only thirty-three of Defendants' 171 facts; moreover, in most of these instances the cited evidence does not actually refute Defendants' contention. Plaintiffs respond that many of Defendants' facts are "[d]isputed by facts referenced in Plaintiffs' Statement of Additional Material Facts," but never do Plaintiffs identify which, if any, of their 213 facts they contend refute any of Defendants' facts. This is inadequate. *Smith v. Mercer*, 572 F. App'x 676, 678 (11th Cir. 2014) (where the plaintiff responded to the defendants' facts without including citations to evidence of record, district court properly deemed the defendants' facts admitted pursuant to LR 56.1, NDGa); *Smith v. Akstein*, 408 F. Supp. 2d 1309, 1314 (N.D. Ga. 2005) (deeming admitted

the defendants' facts, which the plaintiff disputed generally but without providing citations to evidence controverting those facts).[3]

Additionally, Plaintiffs have raised a litany of patently meritless objections to Defendants' facts. Of the 171 paragraphs contained in Defendants' statements, Plaintiffs expressly admit only seventeen, and there are only twenty-three to which Plaintiffs have not objected. Each fact that is objected to is objected to for a laundry list of reasons, but other than conclusory assertions that, for example, a fact is "misleading" or a witness whose affidavit is cited by Defendants is "unqualified," Plaintiffs have articulated no explanation for any of their objections. Plaintiffs have even objected to facts that elsewhere in the same document they concede are undisputed. *See*, *e.g.*, [186-1] at ¶¶ 91, 112. Such rote objections and repudiations of undisputed contents of documents  are altogether unhelpful in "focusing the district court's attention on what is, and what is not, genuinely controverted." *Brown v.*

---

[3] Even if it were otherwise proper to dispute Defendants' facts by making only a general reference to Plaintiffs' statement of facts, many of those facts are likewise devoid of record citations or cite only to evidence that does not support the factual assertion. *See*, *e.g.*, [186-2] at ¶¶ 53, 134, 154, 181, 182 (no citations at all); [187-2] at ¶ 22 (same); *id.* at ¶ 163 (fact unsupported by citation); [187-2] at ¶¶ 12, 29 (same).

*Cobb County*, No. 1:13-cv-1807-WSD, 2015 WL 1524762, at *3 (N.D. Ga. Apr. 1, 2015).

"Plaintiffs['] failure to comply with local rule 56.1 is not a mere technicality." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009). By mindlessly objecting to most of Defendants' facts, omitting citations to evidence when attempting to dispute facts, and refusing to concede what are in reality undisputed facts, Plaintiffs have unnecessarily complicated the Court's task. "A litigant on summary judgment cannot shift their burden to the court with the expectation that it will unearth any beneficial evidentiary nuggets that the filer may have neglected to mention." *Johnson v. AutoZone, Inc.*, 768 F. Supp. 2d 1124, 1154 n.162 (N.D. Ala. 2011). "Federal judges are not archaeologists. We possess neither the luxury nor the inclination to sift through that mound of obfuscation in hopes of finding a genuine issue of material fact to deny summary judgment." *Carolina Acquisition, L.L.C. v. Double Billed, L.L.C.*, 627 F. Supp. 2d 1337 (S.D. Fla. 2009); *see also United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

As a result of Plaintiffs' disregard of Local Rule 56.1, Defendants' facts are deemed admitted except insofar as they are refuted by properly supported facts contained in Plaintiffs' statement of material facts. However, this does not discharge Defendants' burden at summary judgment; the Court must still review the evidence of record to determine whether Defendants are entitled to judgment as a matter of law. *Mann*, 588 F.3d at 1303.

### B.    Dooling's Incarceration and Medical Assessments

On the evening of August 12, 2010, Dooling was arrested and booked into the Henry County Jail. After midnight, on August 13, the forty-two-year-old underwent an initial medical screening with Defendant Leverette, who worked as a registered nurse at the jail. He informed Leverette that he had a history of asthma, chronic obstructive pulmonary disease, stroke, and heart attack. Dooling identified certain medications that he had taken, and around this same time, certain of his medications had been delivered to the jail by his girlfriend and were shortly approved for administration to Dooling. Leverette noted that Dooling was wheezing and complaining of shortness of breath, so she

obtained a telephone order from the on-call provider and administered a nebulizer breathing treatment for Dooling's asthma. He stabilized and was released to general population. Leverette filled out an order that Dooling be seen by the next provider—referring to a doctor or a PA— who would come to the jail to see inmates.[4]

On the evening of August 15, 2010, Dooling again reported to the medical department complaining of shortness of breath and chest pain. The nurse on duty telephoned Defendant Davy, a physician assistant ("PA") who was the on-call provider, who ordered that a nebulizer treatment be administered (twice if necessary) and that Dooling be held in medical for observation. Defendant McAdams observed Dooling on August 15 and assessed him while the second nebulizer treatment was being administered. Dooling told her that he was feeling better and that his pain had subsided, and she observed that his breathing was regular and non-labored, his skin was cool and dry to the touch, and he had no complaints of nausea, vomiting, or headache. When Davy called back to

---

[4] There is no doctor at the jail every day. Generally, a doctor or a PA would visit the jail about three times a week to visit with inmates.

7

check on Dooling a short time after his orders had been given, Dooling

reported that he was feeling better, was breathing well, and had no

chest pain.

Early in the morning on August 16, while still being held for

observation in the medical department pursuant to Davy's order,

Dooling was assessed by Defendant Farid, a licensed practical nurse.

Farid observed that Dooling was resting, was exhibiting no signs of

distress, and verbalized that he had no shortness of breath or other

complaints. That evening, Leverette again assessed Dooling, who

indicated that he was not experiencing any shortness of breath or chest

pain and again exhibited no signs of distress.

Around 9 a.m. on August 17, Dooling was examined by PA Eric

Rose as a follow-up to his intake screening with Leverette on August 13.

Dooling informed Rose that he smoked half a pack of cigarettes a day;

he had a history of heart attack, stroke, hypertension, and asthma; and

his last visit to the emergency room had been one month before his

arrest. Dooling also stated that his doctor had told him that he needed a

pacemaker defibrillator, and Rose requested copies of Dooling's medical

records from that doctor. Rose performed a physical examination of Dooling and noticed wheezing in his lungs. Among other actions taken, Rose prescribed medication and ordered that nebulizer treatments be administered every four to six hours as needed to treat Dooling's asthma.

Dooling was assessed by Leverette again on August 17, and he showed no distress and did not complain of shortness of breath or chest pain. On August 18, after Dooling's lab work was reviewed, he was released from medical back to general population. Between August 18 and September 8, additional tests were performed, but the evidence shows that Dooling had no other medical problems or visits to medical until early in the morning on September 10, when he presented complaining of shortness of breath and indicating that he had not had his inhaler for several days. Leverette assessed Dooling and noticed audible wheezing. She administered two nebulizer treatments, and after they were complete and Dooling had no further complaints, he was released from medical that same day. An albuterol inhaler was ordered that Dooling would be permitted to keep on him for use as needed.

9

### C.    The Events of September 12–13, 2010

On the afternoon of September 12, Dooling again sought a breathing treatment for his asthma. Marie Lemo, a licensed practical nurse, heard wheezing in his lungs, checked his orders to confirm that breathing treatments had been ordered, and administered two nebulizer treatments, after which Dooling told her that he felt better and asked her about an unrelated issue with a broken tooth that was causing him pain. Lemo put Dooling on the list to see the next provider who would visit the jail to determine whether he needed to see a dentist or whether he could be prescribed pain medication in light of the medications he was taking. Dooling was then released back to general population. At approximately 8:45 or 9:00 that evening, Lemo was making rounds to pass out medications to inmates, including Dooling, who told her that he was feeling better. She observed him talking, laughing, and joking with other inmates with no appearance that he was experiencing further problems.

Later that night, at approximately 11:15, Dooling's cellmate Jeffrey Gotch pressed a call button and reported that Dooling was

having an asthma attack. A jailer in the tower received the call and notified Defendant Parks—the jailer stationed in medical—that there was an inmate who was having trouble breathing. Defendants Bates and Green—two jailers assigned to A Pod, where Dooling was housed— were also in the tower when Gotch's call was received, and they responded to Dooling's cell. Dooling was responsive and informed the officers he was having trouble breathing. The officers asked Dooling whether he was able to walk downstairs to retrieve his jumpsuit and go to the infirmary, and Dooling responded that he could. He retrieved the jumpsuit and put it on, then sat down in the day room. Green sent someone to get Dooling's inhaler from his cell, and Dooling continued to talk to him and joke around while they were waiting. Green observed Dooling use his inhaler, but it did not appear to be helping him.

At some point, Dooling told the officers that he did not think he could walk to medical, and the officers called for medical to bring a wheelchair. A short time later—approximately two to five minutes— medical had not arrived, so Green stayed with Dooling while Bates and another inmate went to look for a wheelchair. Minutes later they

returned, placed Dooling in the wheelchair, and began wheeling him to the medical department. Defendant Fowler, a detention officer at the Henry County Jail, joined the entourage as Dooling was being transported to medical. Dooling was initially coherent and able to hold his legs up, but as they approached the third set of doors between A Pod and the medical department, Dooling's feet dropped, his posture became more slouched in the wheel chair, and he became unresponsive. Another officer went to the front of the wheelchair to hold Dooling's feet off the ground so he could be wheeled into the medical department.

Parks, who had received notification from the tower after Gotch's call was placed, had notified Farid that an inmate suffering from an asthma attack was en route to medical. Lemo observed the officers wheeling Dooling into medical and told Larimer—a licensed practical nurse who was working in the pharmacy—what was happening. Larimer then called McAdams, who was working in intake, to come assist with Dooling.

Somebody on the staff called for an ambulance at 11:30 p.m., right around the time that Dooling arrived to the medical department. The

12

medical staff placed oxygen via a nasal cannula and attempted to read

Dooling's vital signs but were unable to obtain a blood pressure reading

or a pulse. Dooling was moved to a stretcher and McAdams had just

begun performing CPR when, at 11:32 p.m., someone announced that

the ambulance had arrived. CPR was continued while Dooling was

being taken to meet the ambulance, and at 11:33 p.m., treatment of

Dooling was turned over to emergency medical services personnel. The

ambulance transported Dooling to Henry Medical Center, where he was

pronounced dead after midnight on September 13. His autopsy report

listed his cause of death as hypertensive cardiovascular disease.

    According to the Correcthealth Defendants' expert, Steven

Shelton, the medical staff at the Henry County Jail was attentive to

Dooling's complaints and treated him rapidly and appropriately.

Shelton explains that Dooling's preexisting heart condition placed him

at increased risk for sudden death caused by a cardiac event such as a

myocardial infarction or cardiac arrhythmia. It is that risk that he

contends materialized on September 12, 2010, to cause Dooling's death.

Shelton concludes by opining to a reasonable degree of medical

certainty that the medical responses, care, exams, and treatments comported with the medical standard of care applicable in both correctional and community (i.e., non-correctional) settings.

## II.    Discussion

### A.    Legal Standard on a Motion for Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). There is a "genuine" dispute as to a material fact if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In making this determination, however, "a court may not weigh conflicting evidence or make credibility determinations of its own." *Id.* Instead, the court must "view all of the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor." *Id.*

"The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact." *Id.* (citing *Celotex Corp.*

14

*v. Catrett*, 477 U.S. 317, 323 (1986)). If the nonmoving party would have the burden of proof at trial, there are two ways for the moving party to satisfy this initial burden. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437-38 (11th Cir. 1991). The first is to produce "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Id.* at 1438 (citing *Celotex*, 477 U.S. at 324). The second is to show that "there is an absence of evidence to support the nonmoving party's case." *Id.* (quoting *Celotex*, 477 U.S. at 323).

If the moving party satisfies its burden by either method, the burden shifts to the nonmoving party to show that a genuine issue remains for trial. *Id.* At this point, the nonmoving party must "'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995) (quoting *Celotex*, 477 U.S. at 324).

**B.    The Henry County Defendants Are Entitled to Qualified Immunity from Plaintiffs' § 1983 Claims**

Qualified immunity operates as a defense to a suit against a public official in his individual capacity when the conduct alleged "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known" at the time of the violation. *Kingsland v. City of Miami*, 382 F.3d 1220, 1231 (11th Cir. 2004). Although § 1983 "on its face admits of no defense of official immunity," *Buckley v. Fitzsimmons*, 509 U.S. 259, 267 (1993), the doctrine of qualified immunity was developed by courts in an effort to balance "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

Here, it is undisputed that the Henry County Defendants were acting within their discretionary authority at all times relevant to Plaintiffs' claims. Thus, the burden shifts to Plaintiffs to show that qualified immunity should not apply. *Edwards v. Shanley*, 666 F.3d 1289, 1294 (11th Cir. 2012). To satisfy this burden, the plaintiff must

show that: (1) the facts and inferences to be drawn from them, viewed in a light most favorable to him, established a constitutional violation; and (2) the right at issue was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

District courts need not address *Saucier*'s elements in any particular order. *Pearson*, 555 U.S. at 236; *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011) ("if the law was not clearly established, we need not decide if Defendants actually violated the Plaintiffs' rights"). In this case, it is apparent that Plaintiffs have failed to show that the constitutional rights at issue were clearly established on the date of the alleged violation, and therefore the Court will proceed directly to the second prong of the analysis. *See id.* at 236-37 (recognizing that courts should not engage in "an essentially academic exercise" in those cases in which "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."); *Youmans v. Gagnon*, 626 F.3d 557, 562 (11th Cir. 2010) (proceeding directly to the question of whether the applicable law was

clearly established in a case involving a pretrial detainee's claim of deliberate indifference to medical needs).

There are three ways that law can be "clearly established" for purposes of qualified immunity. "First, the words of the pertinent federal statute or federal constitutional provision in some cases will be specific enough to establish clearly the law applicable to particular conduct and circumstances and to overcome qualified immunity, even in the *total absence of case law*." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002). Second, "some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts." *Id.* at 1351. These first two examples involve cases of "obvious clarity" and are not implicated in the case at hand.

The third and final way for a right to become clearly established is "by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." *Jenkins by Hall v. Talladega City Bd. of Educ.*, 115 F.3d 821, 826 n.4 (11th Cir. 1997); *accord Vinyard*, 311 F.3d at 1351-52 (further noting that "most

judicial precedents are tied to particularized facts and fall into this category"). Plaintiffs acknowledge that only cases from "courts *in the relevant jurisdiction*" can put a government official on notice of clearly established rights, [187], p.6 (emphasis added) (quoting *Goebert v. Lee County*, 510 F.3d 1312, 1330 (11th Cir. 2007)), but they cite to no such authority. Instead, they rely only on the Sixth Circuit's decision in *Estate of Carter v. City of Detroit*, 408 F.3d 305, 312 (6th Cir. 2005). Even if the facts of that case were squarely on point, "the case law of one other circuit cannot settle the law in this circuit to the point of it being 'clearly established.'" *Hansen v. Soldenwagner*, 19 F.3d 573, 578 n.6 (11th Cir. 1994); *accord Kelly v. Curtis*, 21 F.3d 1544, 1550 n.6 (11th Cir. 1994) ("By distinguishing the[] two out-of-circuit decisions that [the plaintiff] has cited, we do not mean to imply that the law can be clearly established for qualified immunity purposes by non-binding precedent.").

Because it is Plaintiffs' burden to show that Dooling's rights were clearly established, and because they have failed to discharge that burden, the Henry County Defendants are entitled to qualified

immunity from Plaintiffs' § 1983 claims. *See D'Aguanno v. Gallagher*, 50 F.3d 877, 880-81 (11th Cir. 1995) (affirming grant of summary judgment based on qualified immunity defense where plaintiffs cited no case law showing that the right at issue was clearly established).

### C. McBrayer Is Entitled to Sovereign Immunity from Plaintiffs' State-Law Claim

McBrayer is the only remaining Defendant against whom Plaintiffs have asserted a state-law claim. The Georgia Constitution provides that "sovereign immunity extends to the state and all of its departments and agencies." GA. CONST. art. 1, § 2, para. IX(e). This immunity extends to counties and to sheriffs who are sued in their official capacities. *Gilbert v. Richardson*, 452 S.E.2d 476, 479, 484 (Ga. 1994); *Cantrell v. Thurman*, 499 S.E.2d 416 (1998).[5]

Sovereign immunity can be waived, but only "by an Act of the General Assembly which specifically provides that sovereign immunity is thereby waived and the extent of such waiver." GA. CONST. art. 1, § 2,

---

[5] A Georgia sheriff is a county actor for purposes of state law even when, as here, he or she is deemed a state actor for purposes of § 1983. *Thornton v. Jackson*, 998 F. Supp. 2d 1365, 1381 (N.D. Ga. 2014) ("While sheriffs, under certain circumstances, may be characterized as state actors for purposes of § 1983, they are officials of the county for purposes of liability under state law.").

para. IX(e); *Gilbert*, 452 S.E.2d at 480 ("sovereign immunity is waived by any legislative act which specifically provides that sovereign immunity is waived and the extent of such waiver"). The burden of establishing waiver is on Plaintiffs, because they are "the part[ies] seeking to benefit from the waiver of sovereign immunity." *DeKalb Cty. Sch. Dist. v. Gold*, 734 S.E.2d 466, 470 (Ga. Ct. App. 2012). Plaintiffs, however, have not responded to McBrayer's sovereign-immunity argument. "Their lack of response is fatal to their state-law claims against [McBrayer] in his official capacity," as neither their "complaint nor their opposition brief identifies a state legislative act that waives sovereign immunity under the facts of this case." *Thornton*, 998 F. Supp. 2d at 1381.[6]

---

[6] Even if Plaintiffs had attempted to meet their burden of establishing waiver, the Court finds it unlikely that they could have done so. Neither statute upon which Plaintiffs bring their claim—O.C.G.A. §§ 42-4-4 and 42-4-32—expressly waives a county's sovereign immunity, and the Court sees no reasonable construction of either statute that could be said to imply such a waiver. *See Gish v. Thomas*, 691 S.E.2d 900, 907 (Ga. Ct. App. 2010) ("[I]mplied waivers of sovereign immunity are not favored."). Indeed, Georgia courts have expressly held that O.C.G.A. § 42-4-4 does not waive "the immunity otherwise granted to a county sheriff acting in his official capacity." *Tattnall County v. Armstrong*, 775 S.E.2d 573, 577 (Ga. Ct. App. 2015) (inmate's allegations of denial of access to proper medical care while he was incarcerated were barred by sovereign immunity).

For these reasons, the Court concludes that McBrayer, as the sheriff of Henry County, is immune from and entitled to summary judgment on Plaintiffs' state-law claim.

### D.    The Correcthealth Defendants

Even though the Correcthealth Defendants were performing services on behalf of the government, they are non-government actors who cannot, at least on the facts of this case, assert any immunity defense. *Richardson v. McKnight*, 521 U.S. 399, 412 (1997) (noting that "§ 1983 immunity does not automatically follow § 1983 liability" and holding that "private prison guards, unlike those who work directly for the government, do not enjoy immunity from suit in a § 1983 case"); *Hinson v. Edmond*, 192 F.3d 1342, 1347 (11th Cir. 1999) (privately employed jail physicians are not entitled to assert the defense of qualified immunity). Thus, the Court now turns to the law governing the provision of medical treatment to pretrial detainees at county jails.

"Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment proscription against 'unncessary and wanton infliction of pain.'" *Kramer v. Gwinnett County*, 306 F. Supp. 2d

22

1219, 1226 (N.D. Ga. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). Where, as here, the plaintiff complains of treatment provided prior to conviction, the claim is governed not by the Eighth Amendment, but "instead by the due process clause of the fourteenth amendment." *Hamm v. DeKalb County*, 774 F.2d 1567, 1572 (11th Cir. 1985). The Eleventh Circuit has held that "in regard to providing pretrial detainees with . . . medical care the minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons." *Id.* at 1574. Consequently, although the Fourteenth Amendment governs Plaintiffs' claims in this case, the Court's analysis is informed by decisions interpreting and applying the Eighth Amendment's prohibition on cruel and unusual punishment.

### 1.    Individual Correcthealth Defendants

To succeed on their § 1983 claims against the individual Correcthealth Defendants, Plaintiffs "must satisfy both an objective and subjective test." *Dukes v. Georgia*, 428 F. Supp. 2d 1298, 1325 (N.D. Ga. 2006), *aff'd*, 212 F. App'x 916 (11th Cir. 2006) (citing *Farrow v. West*, 320 F.3d 1235, 1242 (11th Cir. 2003)). "First, a plaintiff must

23

demonstrate the existence of an objectively serious medical need." *Id.*

There is no dispute that this showing has been made.

> Second, a plaintiff must prove that a jail official acted with
> an attitude of deliberate indifference to that medical need. A
> showing of deliberate indifference has three components: (1)
> subjective knowledge on the part of the jail official that there
> is a risk of serious harm; (2) disregard of that risk; and (3)
> doing so by conduct that is more than mere negligence.

*Id.* (internal citations omitted). Finally, "as with any tort claim, [the

plaintiff] must show that the injury was caused by the defendant's

wrongful conduct." *Goebert*, 510 F.3d at 1326.

As to the showing of deliberate indifference that must be made,

"courts are reluctant to find deliberate indifference" in cases in which

the inmate was provided with medical care or treatment, but "'grossly

incompetent medical care or choice of an easier but less efficacious

course of treatment can constitute deliberate indifference.'" *Dukes*, 428

F. Supp. 2d at 1325 (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1035

(11th Cir. 1989)); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir. 1986)

("Mere negligence or malpractice does not violate the eighth

amendment." Instead, medical care is unconstitutional only when it is

"so grossly incompetent, inadequate, or excessive as to shock the

conscience or to be intolerable to fundamental fairness."). For example, a delay of medical treatment, "even for a period of hours," may constitute deliberate indifference, but "the reason for the delay and the nature of the medical need is relevant in determining what type of delay is constitutionally intolerable." *Seals v. Shah*, 145 F. Supp. 2d 1378, 1384 (N.D. Ga. 2001); *see also Dukes*, 428 F. Supp. 2d at 1325 (a delay in medical care caused by non-medical reasons can constitute deliberate indifference).

Plaintiffs in this case have pointed to no facts in the record that would allow a jury to find that any of the individual Correcthealth Defendants acted with deliberate indifference to Dooling's medical needs. Indeed, the record does not suggest that the medical providers' conduct described above was negligent, let alone that it was "so grossly incompetent, inadequate, or excessive as to shock the conscience." *Rogers*, 792 F.2d at 1058. The undisputed facts show that the symptoms of which Dooling complained on September 12, 2010 were consistent with those for which he had successfully been treated in the past. There is no suggestion that the jailers, the medical staff, the other inmates, or

anybody else knew or could reasonably have known that more urgent medical treatment was needed. Plaintiffs offer nothing more than speculation and conclusory assertions to support their arguments to the contrary, and they have not even attempted to rebut the expert testimony of Dr. Shelton. "[T]he question of whether governmental actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for grounding liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995) (quoting *Estelle*, 429 U.S. at 107).

Because Plaintiffs have failed to point to any evidence creating a genuine issue of material fact as to the liability of the individual Correcthealth Defendants, these Defendants are entitled to summary judgment on Plaintiffs' § 1983 claim.

### 2.    Correcthealth Henry, LLC

For largely the same reasons, Correcthealth itself is also entitled to summary judgment. As a private entity contracting to provide medical services to inmates at a county jail, Correcthealth is "the

26

functional equivalent" of the county government and may be held liable only if it "had a 'policy or custom' of deliberate indifference that led to the violation of [Dooling's] constitutional right." *Craig v. Floyd County*, 643 F. 3d 1306, 1310 (11th Cir. 2011) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). Plaintiffs my establish this "policy or custom" by pointing to a custom or practice of permitting constitutional violations and showing that that custom or practice was "the moving force" behind the violation of Dooling's rights. *Id.* But "'a single incident of unconstitutional activity is not sufficient'" to establish a custom or practice. *Id.* (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985)). Rather, "[c]ustom consists of those practices of city officials that are 'so permanent and well settled' as to have 'the force of law.'" *Gilmere v. City of Atlanta*, 737 F.2d 894, 901 (11th Cir. 1984) (quoting *Monell*, 436 U.S. at 693).

The evidence brought forth by the Correcthealth Defendants, including but not limited to the expert affidavit of Steven Shelton, shows that Correcthealth's medical providers responded to Dooling's complaints and managed his conditions appropriately but that their

efforts were simply inadequate to prevent the sudden cardiac event that actually caused Dooling's death. Plaintiffs contend that Dooling's condition deteriorated during his stay at the Henry County Jail, but the evidence of record does not support the contention that it was any action or inaction of Defendants that caused that deterioration. In the absence of evidence that would allow a reasonable jury to conclude that any policy, custom, or practice of Correcthealth contributed in any way to Dooling's death, Correcthealth is entitled to summary judgment.

## III.  Conclusion

For the foregoing reasons, the Henry County Defendants' motion for summary judgment [154] is granted, and the Correcthealth Defendants' motion for summary judgment [170] is granted. The Clerk is directed to close this case.

IT IS SO ORDERED this 24th day of September, 2015.

Timothy C. Batten, Sr.
United States District Judge